Rita Glavin, Esq. (*pro hac vice* forthcoming)
Glavin PLLC
156 W. 56th Street
Suite 2004
New York, NY 10019
(646) 693-5505

Michael S. Stein, Esq.
Sean Mack, Esq.
Pashman Stein Walder Hayden, PC
21 Main Street, Suite 200
Hackensack, NJ 07601
(201) 488-8200

Attorneys for Plaintiffs
Care One, LLC and Care Realty, LLC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARE ONE, LLC, and<br><br>CARE REALTY, LLC,<br><br>                      Plaintiffs,<br><br>     vs.<br><br>ELIZABETH S. STRAUS, and<br><br>ANDROSKY ("ALBERTO") LUGO,<br><br>                    Defendants. | **No. [To be assigned]**<br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

1. Defendant Elizabeth S. Straus, who resides at 351 Lewelen Circle, Englewood, NJ 07631, is a former Executive Vice President of Care One, LLC ("Care One") and supervisor of operations at Care Realty, LLC, ("Care Realty" and collectively with Care One and their subsidiaries and affiliates, "the Company"), which have their principal place of business at 173 Bridge Plaza North, Fort Lee, NJ 07024. Defendant Straus's paramour Defendant Androsky

"Alberto" Lugo is a former Executive Vice President and General Counsel of the Company and resides at 132 Lakeshore Drive North, Eastchester, NY 10709. From at least 2015 to 2021, Defendants grotesquely and illegally abused their Company positions of power and trust, and engaged in a criminal racketeering conspiracy to defraud the Company and, through an array of schemes, misappropriate tens of millions of dollars of Company funds for their personal benefit. Defendants engaged in that conspiracy to enrich themselves, advance their personal interests, and fulfill their sexual desires at the expense of the Company, by committing numerous crimes under federal law, including wire fraud, possession and interstate transportation of child pornography, money laundering, as well as various crimes under New Jersey law and other illegal activity.

2.      Defendants Straus and Lugo, and at least two business entities that worked with Straus and Lugo, were members and associates of an ongoing criminal racketeering enterprise (the "Straus-Lugo Enterprise") that was engaged in activities that affected interstate commerce.  The Straus-Lugo Enterprise operated in the District of New Jersey and elsewhere.

3.      The purposes of the Straus-Lugo enterprise included, among other things, the following:

        a.      Enriching Straus and Lugo, and members and associates of the enterprise who demonstrated loyalty to Straus and Lugo and a willingness to assist and conceal their illegal activities;

        b.      Preserving, protecting, promoting, and enhancing the power of the Straus-Lugo Enterprise;

        c.      Fulfilling the personal desires of Straus and Lugo, including their sexual gratification;

     d.     Enabling Straus and Lugo to engage in criminal and other illegal activity, including: wire fraud; money laundering; possession and transportation of child pornography; falsifying documents; and concealing the commission of such acts; and

     e.     Protecting the Straus-Lugo Enterprise from detection by the Company and prosecution by law enforcement authorities, including through acts of intimidation, falsification of documents, fabrication and obfuscation of invoices, false statements, destruction of evidence and making false and defamatory claims against the Company and Company personnel after the Company discovered the fraud.

4.     The means and methods of the Straus-Lugo Enterprise included, among other things, the following:

     a.     Defendant Straus's and Lugo's abuse of their authority as executives of the Company to approve contracts, business and services with vendors in exchange for the vendors' assistance in defrauding the Company and embezzling money from the Company;

     b.     Defendants Straus and Lugo directing and causing the fabrication and obfuscation of invoices to the Company to enable them to issue improper payments from the Company to vendors that performed services for the personal benefit of Straus and Lugo and not for the Company;

     c.     Making false statements to Company employees and others about various purchases and services in order to misappropriate funds from the Company, which were used to pay for Defendants Straus's and Lugo's personal purchases and expenses, including landscaping, luxury goods, interior decorating, and furnishings;

     d.     Defendants Straus and Lugo embezzling Company funds by using Company corporate credit cards to make unauthorized and extravagant personal purchases

with no legitimate business purpose and abusing their positions to ensure the Company paid for those charges;

e.    Defendants Straus and Lugo creating a toxic and fearful work environment at the Company to ensure the continuation of the Straus-Lugo Enterprise, including by threatening, abusing, and terminating the employment of Company employees who questioned their behavior or voiced concerns about invoicing practices involving vendors assisting Straus and Lugo in their fraud and concerns about charges reflected in credit card statements;

f.    Misappropriation of Company funds to pay for rent and security deposits for vacation homes used by Defendant Straus;

g.    Defendant Lugo engaging in sexual relationships with Company employees and using those relationships to compromise those employees for his personal benefit, including advancing the objectives of the Straus-Lugo Enterprise;

h.    Defendant Lugo improperly misappropriating Company funds to pay for a personal home surveillance system for illicit purposes, including the production of child pornography; and

i.    Defendant Straus, with the assistance of Defendant Lugo, making false, inflammatory, defamatory, and meritless allegations against the Company and Company employees after the Company discovered their fraud in an effort to deflect and distract from their extensive illegal activities.

5.    As a result of the Defendants' illegal activities, Straus and Lugo systematically defrauded the Company and embezzled more than $40,000,000 from the Company.   In addition to the federal crimes and racketeering activity described herein by committing these acts against

the Company, Defendants also breached their fiduciary duties and committed common law fraud and conversion.

6.      In this action, Plaintiffs seek equitable and legal relief for Defendants' violations of the: (1) Civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c) (Conducting an Enterprise); (2) Civil RICO, 18 U.S.C. § 1962(d) (Conspiracy); (3) Breach of Fiduciary Duty; (4) Fraud; (5) Negligent Misrepresentation; (6) Conversion; and (7) Unjust Enrichment.

## I.    <u>JURISDICTION AND VENUE</u>

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action involves violations of RICO, 18 U.S.C. § 1962, as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the District of New Jersey under 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in New Jersey, and because Plaintiffs' corporate headquarters is located in Fort Lee, New Jersey and they conduct business in this District, and Defendant Straus resides in New Jersey.

## II.    <u>PARTIES AND PERSONAL JURISDICTION</u>

9.      Plaintiff Care One, LLC is a corporation organized under the laws of Delaware and domiciled in the State of New Jersey. Care One is a healthcare company which, through subsidiaries and affiliates, operates approximately seventy facilities across the northeastern United States, including those providing subacute, nursing, assisted living, and hospice services. Care One, through subsidiaries and affiliates, also provides nurse practitioner services, homecare, and

operates an institutional pharmacy. Care One is registered to do business in the State of New Jersey. Care One is a victim of Defendants' extensive years-long fraud and embezzlement.

10. Plaintiff Care Realty is a Delaware corporation organized under the laws of Delaware and domiciled in New Jersey. Care Realty, through subsidiaries, owns nursing homes and uses the services of a Care One subsidiary to manage Care Realty's nursing homes. Care Realty is one of the victims of Defendants' fraud and embezzlement. Care Realty is a victim of Defendants' extensive years-long fraud and embezzlement.

11. Defendant Straus, a resident of New Jersey, was at all relevant times the Executive Vice President of the Company and, among other authority, was responsible for overseeing Care One's business operations during the relevant period. As a senior executive of the Company, Defendant Straus oversaw the Company's selection of vendors, processing of invoices, and payments to vendors. Defendant Straus also had the ability to terminate Company employees. Defendant Straus is also the daughter of the founder and CEO of the Company, who trusted Defendant Straus to act in the best interests of the Company and not defraud, embezzle and misappropriate Company funds. The Company terminated Defendant Straus's employment in February 2022 after it discovered the fraud engaged in by Straus and Lugo.

12. Defendant Lugo, a resident of New York, was at all relevant times the General Counsel and Executive Vice President of the Company for over ten years and performed services as an executive of the Company in the State of New Jersey. As a senior executive of the Company, Defendant Lugo had broad authority to act on behalf of the Company, including overseeing the Company's selection of vendors, processing of invoices, and payments to vendors. Defendant Lugo also had the ability to terminate Company employees. Defendant Lugo was one the closest and most trusted advisors of the founder and CEO of the Company, who trusted Defendant Lugo

to act in the best interests of the Company and not defraud, embezzle and misappropriate Company funds.  On August 27, 2021 Defendant Lugo was charged by the Office of the District Attorney in Westchester County, New York with creating and distributing child pornography.  On or about September 10, 2021, upon learning of the charges, the Company placed Defendant on leave and in October 2021,  terminated his employment.

13.    This Court has personal jurisdiction over the Defendants because (1) Defendant Straus is domiciled in New Jersey; (2) the events giving rise to this action occurred while Defendants were employed at the Company's headquarters in New Jersey; (3) in furtherance of their fraudulent scheme, Defendants submitted and caused to be submitted falsified invoices, directed other members of the Straus-Lugo Enterprise, as described herein, and otherwise perpetuated their fraudulent actions against Plaintiffs from New Jersey; (4) Defendants' illegal conduct affected Plaintiffs in New Jersey, where their headquarters and principal places of business are located; and (5) Plaintiffs suffered harm in New Jersey as a result of the Defendants' actions, including the loss of more than $40,000,000.  The exercise of personal jurisdiction over the Defendants is reasonable and comports with traditional notions of fair play and substantial justice, as the Defendants' conduct was expressly aimed at and caused harm to a New Jersey citizen.

## III.    FACTUAL ALLEGATIONS

14.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above, with the same force and effect as if fully set forth herein.

15.    Defendant Straus was Care One's Executive Vice President from July 2008 to September 2021.  As Executive Vice President, Defendant Straus oversaw Care One's day-to-day operations, including Care One's selection of vendors, authorizing payments to vendors, as well as decision-making concerning Care One employees.  Defendant Straus also had supervisory

authority over the operations of Care Realty and could direct payments from accounts controlled by Care Realty.

16.     Defendant Lugo was the Company's General Counsel and Executive Vice President of Operations from at least 2015 to in or about September 2021 and reported directly to the Company's CEO and founder.  Defendant Lugo has responsibility for almost every aspect of the Company's operations. Among other things, Lugo had authority to make decisions concerning payments from Company accounts, the Company's selection of vendors, issuance of payments to vendors, personnel management, and employee compensation.

17.     Since at least 2017 – and likely for many years before that – Defendants maintained an intimate sexual relationship, which they sought to conceal from the Company, its employees and from their families, including the Company's CEO.  Beginning at least as early as 2015, Defendants conspired to embezzle funds from the Company to enrich themselves and to fund their lavish lifestyles.

18.     From in or about 2015 to 2021, Defendants embezzled over $40,000,000 from the Company.

19.     Defendants executed their scheme to defraud the Company by, among other things, exploiting their positions and authority as senior executives of the Company to (1) charge personal expenses to their corporate credit cards, (2) reimburse themselves for the leasing of properties in New York City and in the Hamptons, (3) approve payments by the Company to vendors to provide for services to themselves or to their family members – rather than to the Company; and (4) approve payments to co-conspirators for their participation in their scheme.

20.     As the two most senior executives at the Company on a day-to-day basis, each of the Defendants should have functioned as a check on the other's actions and exercise of their respective authority.  Instead, Defendants each used their positions and authority to enable them to approve the other's improper spending and to conceal their fraudulent activities from Company staff, and to intimidate and silence any Company personnel that voiced their suspicions about either Defendants' activities.

21.     To perpetuate their fraud against the Company, and to conceal their actions, Defendants created a toxic and hostile work environment in which they intimidated, berated, threatened, or terminated the employment of Company personnel who questioned or voiced any concerns about Defendants' activities.  By instilling such a culture of fear throughout the organization, Defendants were able to bypass or override the Company's compliance controls, hide information from the Company's CEO and others to conceal their fraud, and even physically destroy their Company-issued devices to avoid leaving evidence of their unlawful activities.

22.     For example, according to a New Jersey state court lawsuit filed by former Care One employee Danielle DeVincenzo, from in or about July 2011 to 2014, Defendant Lugo was involved in a sexual relationship with DeVincenzo, who reported to Defendants Straus and Lugo. The relationship ended after DeVincenzo became aware that Defendants Straus and Lugo were themselves involved in a sexual relationship.  According to the lawsuit, in July 2014, Defendants Straus and Lugo propositioned DeVincenzo to engage in sex acts with them during a business trip to Massachusetts.  DeVincenzo declined to do so.  After that incident, DeVincenzo felt uncomfortable and intimidated around Defendants Straus and Lugo, including because Defendant Lugo sent her photos of himself undressed and Defendant Straus instructed her to break up with

her boyfriend, invited her on vacations, and was angry when Plaintiff brought her fiancé to a work event.

23.    On several occasions during the period in or about 2016-2017, DeVincenzo objected to the billing of inaccurate invoices, including personal invoices of Defendants Straus and Lugo. DeVincenzo also raised concerns about Defendant Straus's conduct, including Defendant Straus's requests that DeVincenzo ask doctors to write personal prescriptions for Defendant Straus. In or about July 2017, Devincenzo was placed on leave from Care One shortly after a contentious meeting with Defendant Straus, who threatened her with legal action if she did not cease a particular friendship and business relationship. DeVincenzo was terminated soon thereafter and brought a lawsuit against the Company setting forth these allegations. *See Danielle DeVincenzo v. Care One LLC et al.*, BER-L-004570-19, Superior Court of New Jersey, Bergen County. The Defendants took steps to keep others from discussing the lawsuit with the Company's CEO in order to conceal their improper conduct and the toxic work environment they created.

24.    Through these kinds of methods, Defendants were able to use funds misappropriated from the Company as their personal slush fund, through which they enriched themselves, funded their extravagant lifestyles, and funneled stolen Company funds to their associates and co-conspirators.

25.    As described further herein, Defendant Lugo used unauthorized Company funds to manufacture child pornography at his residence in Eastchester, New York, and stored that criminal contraband at the Company's headquarters in New Jersey. Specifically, using unauthorized Company funds, Defendant Lugo constructed a pool, mini golf course, bowling alley, and sophisticated surveillance equipment, among other things, at his personal residence to entice children to his home and manufacture child pornography. Upon information and belief, in order

to conceal his criminal activities, in or about 2020, Defendant Lugo transported devices containing his child pornography from New York to the Company's headquarters in New Jersey, where he hid his contraband.  Due to the work environment that Defendants had created, in which Company employees feared retaliation if they questioned Defendants' activities or failed to comply with their instructions, Defendants were able to use subordinates who did not know the content of the devices to guard the child pornography at the Company's offices.

26.    On August 27, 2021, the Westchester County District Attorney's Office charged Defendant Lugo in Eastchester Town Court with Promoting an Obscene Sexual Performance by a Child, Possessing an Obscene Sexual Performance by a Child, and Unlawful Surveillance in the Second Degree.  Upon learning of the charges, the Company immediately placed Defendant Lugo on administrative leave and launched an internal inquiry into whether Defendant Lugo maintained any of his criminal contraband at the Company's offices.  Upon learning of the Company's inquiry into Defendant Lugo's criminal activities, Defendant Straus retrieved certain devices that Defendant Lugo had secured in a locked safe and/or cabinet at the Company and transported them to her residence in New York, where, upon information and belief, she subsequently disposed of them because those devices contained evidence of Defendant Lugo's illegal activities.

### A.  Defendants Used Their Corporate and Personal Credit Cards to Fraudulently Embezzle and Otherwise Misappropriate Millions of Dollars from the Company

27.    Between at least 2015 and 2021, the Defendants financed their extravagant lifestyles by, improperly exploiting their access to the Company's corporate credit cards and causing the Company to pay personal expenses that they improperly charged to the Company's corporate credit cards.  They improperly used Company funds to pay for lavish hotels, private flights, cosmetic treatments, clothing and accessories, artwork, and other personal purchases. Defendants were able to implement their fraudulent misappropriation of funds by creating a

framework within the Company pursuant to which they would fraudulently "approve" their own improper expenses while also creating an environment in which employees feared retaliation for raising any concerns about Defendants' activities. Further, in order to conceal the fact that they had made improper personal purchases with their Company corporate credit cards, Defendants fabricated supporting documentation and lied to the Company.

28.     From 2015 to 2021, the Company held Mastercard, American Express, and other corporate credit card accounts, and issued these cards to only senior-level executives, such as Defendants. According to the Company's policies and procedures, executives were authorized to use their Company corporate credit cards only for legitimate business purposes, such as for business meals, authorized travel-related expenses, and supplies for corporate events.

29.     The Company had controls in place to ensure compliance with its policies concerning documentation of business expenses. However, the Defendants used a pervasive pattern of intimidation of underlings to bypass those controls.

30.     For example, each month, upon receiving the credit card statements from the credit card companies, Defendants' executive assistant would review the charges and request that Defendants provide supporting documentation for any that appeared to be personal – rather than business – expenses. When the executive assistant had questions about how to allocate a particular expense after examining the statement's description for the charge, she would ask the Defendants, who instructed her how to allocate it. However, unlike other Company executives who held corporate credit cards, Defendants refused to provide the requested supporting documentation or receipts and instead lied about the nature of these charges to their executive assistant. The executive assistant did not raise any concerns about Defendants' conduct out of fear of verbal abuse, threats, and termination of her employment. Further, when members of the Company's

finance team raised concerns about any allocations made from the executive assistant's review of Defendant Straus's corporate credit card statements, Defendant Straus would berate or threaten them into approving the charges.

31.     Defendants regularly communicated through e-mails, text messages, and other methods to strategize concerning how to deceive the Company into paying for the improper personal purchases that they had charged to their credit cards.  For example, Defendant Lugo would alert Defendant Straus when the Company was experiencing liquidity issues, because excessive spending or exceptionally large purchases on corporate credits would be more closely scrutinized during such times.

32.     During the course of the conspiracy, Defendant Straus improperly used her corporate credit cards to pay for more than $10,000,000 in personal purchases that had no legitimate business purpose.  As described in more detail below, charges included payments for luxury department store purchases, personal home furnishings, artwork, private helicopter and jet charter services, five-star hotels, beauty treatments, cosmetic surgery and treatments, and other personal expenses.

33.     Specifically, from 2015 through 2021, Defendant Straus utilized her Company corporate credit cards to improperly spend millions of dollars on clothing, accessories, and other merchandise from luxury department stores, such as Bergdorf Goodman, Dior, Sak's Fifth Avenue, Brunello Cucinelli, and Barney's New York.  Defendant Straus spent over $4,000,000 at Bergdorf Goodman and Saks Fifth Avenue alone.

34.     From 2015 through 2021, Defendant Straus improperly charged over $3,300,000 to her Company corporate credit cards for personal home furnishings.

35.    From 2018 through 2021, Defendant Straus also improperly charged more than $750,000 to her corporate credit cards for personal purchases of artwork that had no legitimate business purpose.

36.    From 2015 through 2021, Defendant Straus improperly charged over $1,000,000 to her Company corporate credit cards for private air travel for vacations and trips that had no legitimate business purpose.  In particular, from March 2020 to March 2021, Defendant Straus chartered private helicopter and jet services on dozens of occasions to travel to and from the Hamptons in Long Island, New York for vacations.  Defendant Straus charged hundreds of thousands of dollars to her Company corporate credit cards for these private flights.  When discovered, Defendant Straus forged invoices from the private helicopter and jet charter service provider to make it appear as if the flights were to various hospitals throughout New York and Massachusetts for Company work-related purposes.  However, credit card statements confirm that those flights were to and from New York and airports in the Hamptons and served no business purpose.

37.    From 2018 through 2021, Defendant Straus also made over $200,000 in unauthorized charges to her corporate credit card for vacations at five-star hotels, including Hotel du Cap Eden Roc in France, Eden Roc in St. Barthélémy, several Four Seasons Hotels, Hotel Amangiri in Utah, Grand Hotel du Cap Ferrat in France, and Faena Hotel in Miami Beach.  None of these trips were for Company business, and therefore, Defendant Straus was not authorized to charge these expenses to her corporate credit card.

38.    From 2018 through 2021, Defendant Straus improperly charged over $390,000 to her corporate credit cards for personal health and beauty treatments, as well as for cosmetic surgery performed by Dr. Lara Devgan, a plastic surgeon based in New York City, and related expenses.

These expenses also included purchases at the Rescue Spa ($96,594.96), JTAV Clinical Skin Care ($78,332.89), Gym Source ($26,587.06), and Joanna Czech ($49,787.41), a spa and skincare company.

39.    Similarly, from 2015 to 2021, Defendant Lugo improperly charged more than $5,000,000 to his Company corporate credit cards for personal purchases that had no legitimate business purpose.    These charges included payments for his personal taxes, private air transportation, clothing, construction at his residence, fashion accessories, luxury department store purchases, artwork, hotels, restaurants, and home furnishings.

40.    From 2020 to 2021, Defendants also directed the Company to make payments on their personal credit cards for non-business expenses.  As a result, from 2020 to 2021, the Company paid over $3,000,000 in personal credit card payments made for the benefit of Defendant Lugo, and $750,000 for the benefit of Defendant Straus.

**B.  Defendants' Fraudulently Caused the Company to Pay Vendors for Services Performed for Defendants' Personal Benefit**

41.    The Defendants' scheme to defraud the Company also involved leveraging vendors who unlawfully billed the Company for services provided to Defendants and/or their personal associates.

42.    From at least 2015 to 2021, Defendants conspired with various vendors, some of whom were their personal friends, to defraud the Company into paying for services that the vendors provided to Defendants for their personal benefit, such as landscaping, construction, and interior design services at Defendants' residences.  The vendors involved in the Defendants' scheme included Bullet Communications Inc., Monello Landscape Industries LLC ("Monello") and its affiliates, The Reichert Consult, P. Adam Studios, Health Capital HR LLC, and eInteractive.

43.     Defendants communicated with vendors through text messages, e-mail, and other methods to arrange for the creation of false invoices for these services for their personal benefit and submitted them to the Company for payment.  Defendants directed vendors to falsify invoices by, for example, removing details of the work performed for Defendants' personal benefit and including the value of those illegitimate services in invoices for legitimate services that these vendors provided to the Company.  Therefore, the invoices would appear to the Company as if all work had been performed for the Company, including at various Company properties, rather than at Defendants' personal residences.  On other occasions, Defendants directed the vendors to bill personal invoices to specific Company locations without any detail of the services that had been provided.  On certain occasions, Defendants simply paid for these services using their corporate credit cards.  To reward these vendors for their participation in Defendants' fraudulent scheme, Defendants abused their positions at the Company to direct significant Company business to these vendors.

### i.     *Defendant Lugo's Fraud Involving Bullet Communications*

44.     From 2015 to 2021, Defendant Lugo defrauded the Company into paying over $600,000 to Bullet Communications for data cable installation services at Defendant Lugo's home in Eastchester, New York that served no legitimate business purpose.  Defendant Lugo concealed the fact that these services provided by Bullet Communications were for his personal – rather than the Company's – benefit, by causing the invoices that Bullet Communications submitted to the Company to be altered.  For example, on February 11, 2015, Bullet Communications submitted an invoice to the Company for work that it had performed at Defendant Lugo's Eastchester Home.  However, the contents of the invoice were concealed by whiting out or deleting the description of the work that Bullet Communications had performed.

ii.    *Defendants Fraudulently Conspired with Monello Landscaping Services and Used Threats and Intimidation To Conceal and Perpetuate the Fraud*

45.    In or around 2015, Defendants conspired with Monello, a New Jersey-based landscape design and installation company to defraud the Company into paying for work that Monello had performed at Defendant Lugo's residences.  Furthermore, due to Defendants' control over the Company's vendor procurement and payment processes and their corrupt relationship with Monello, Defendants ensured that the Company did not implement a competitive bidding process before hiring Monello to perform landscaping services at various Company facilities, which also secured Monello's loyalty in performing personal services for Defendant Lugo at the Company's expense.  As a direct result, Defendants caused the Company to pay Monello millions of dollars for services not related to Company business but for the personal benefit of Defendants.

46.    Beginning in 2015, Monello performed various landscaping services at Defendant Lugo's personal residence and improperly billed millions of dollars to Plaintiffs for that work.  The services that Monello provided at Defendant Lugo's personal home included repairs to Defendant Lugo's rear patio; foundation excavations; sealer installations; masonry work; and construction of a pool, mini golf course, and bowling alley; all of which were not related to Company business. The projects carried out by Monello at Defendant Lugo's residence were exceptionally extravagant and were subsequently featured on Monello's website as an "award winning residential paradise."

47.    Beginning in 2015, Monello also provided free landscaping and other services to Defendant Lugo and his family members as a kickback for the substantial Company business that Defendant Lugo directed to Monello.  For example, on various occasions, Monello provided free property maintenance work, lawn cuts, interior carpeting, heating, ventilation, air conditioning services, patio repairs, and irrigation work at Lugo's brother's residence.  Further, Monello periodically provided free property maintenance work and lawn cuts at the residence of another

17

Lugo brother.  In other instances, Monello provided free property maintenance work and lawn cuts at the residence of Defendant Lugo's sister-in-law.

48.    During this time, various Company employees raised concerns about Monello's substantial rates and suspicious invoicing practices.  Even though Company employees believed that Monello's invoices were suspicious and found Defendants' explanations about Monello's invoices to be a "complete lie," they nevertheless processed the payments as instructed by the Defendants.  In April 2015, the Executive Director of a Company facility in New Jersey, raised questions about Monello's invoices for work performed at that facility, noting that the labor and other costs appeared to be inflated.

49.    In order to conceal the fraudulent invoices from Plaintiffs, Defendant Straus directed Monello to send invoices directly to her, rather than to the proper individuals on the Company's finance team who were responsible for such review, and threatened to terminate the Company's contract with Monello if Monello refused to comply.  On August 11, 2015, Defendant Straus sent a text message to the owner and Chief Operating Officer of Monello stating, "I am never going to give you another job again if you don't follow what I have asked you to do in terms of only sending me the invoices for payment.  They are never supposed to be sent to [Plaintiff Care One's Vice President of Purchasing] as I have asked of you in person and on the phone.  I thought I made myself clear but apparently it was not.  I do not like to deal with vendors who put me in situations that I constantly have to clean up various issues.  Please don't be sloppy when it comes to any of the requisitions or invoices that are sent for payment.  If this continues, we will finish up the jobs and stop doing business together."  Later that day, Monello acknowledged that his company had not followed Defendant Straus' instructions in submitting invoices, apologized to

Defendant Straus for the "trouble this mistake caused," and stated that he would be "much more careful" going forward.

50.    As suspicions about Monello increased within the Company, Defendants threatened or terminated the employment of anyone that voiced their concerns or otherwise sought to hinder Defendants' unlawful activities.  In or around 2017, the Company's then Chief Financial Officer raised numerous concerns about Monello's invoices, and as a result, Defendants terminated the Chief Financial Officer's employment.  Around the same time in 2017, the Company's then Director of Finance expressed his own concerns about Monello to others at the Company.  In response, on August 1, 2017, Defendant Straus emailed the Director of Finance and threatened that "[i]f you continue to share your opinion with [Care One's then-Controller] or anyone else, I will have you moved back to a cubicle where perhaps there is a little more oversight and transparency on what you are working on […] Do not repeat or give your opinion on any vendors […] [I]f you get involved and create issues …, I will limit your job description further."

51.    Further, when the Company's finance team raised concerns about Monello to Defendant Lugo, he forwarded these communications to Defendant Straus so that she could fabricate false justifications for the invoices on Defendant Lugo's behalf.  Because Defendants' relationship was kept hidden from the Company, Defendant Straus was able to use her position to make it appear that she was providing a non-conflicted authorization of Defendant Lugo's expenses when, in reality, she was furthering her and Lugo's clandestine racketeering enterprise.

52.    Due to the various concerns raised at the Company about Monello, Defendants Straus and Lugo also conspired with Monello to bill the Company through *alter ego* corporations for the personal services that Monello rendered to Lugo.  For example, at Defendant Lugo's request, the owners of Monello established JC Mac Development LLC to handle Monello's

contracts with the Company in Massachusetts. From 2018 through 2021, the Company paid JC Mac Development LLC hundreds of thousands of dollars. However, during this time, JC Mac Development LLC also performed personal services for Defendant Lugo and his relatives, and fraudulently billed the Company using invoices that misrepresented that these were services provided to the Company facilities. From 2018 through 2021, the owners of Monello also used SJN Services LLC to perform personal services to Defendant Lugo and his relatives, while billing the Company for this work. During this time, however, SJN Services did not perform any legitimate services for the Company, but yet, the Company paid SJN Services hundreds of thousands of dollars. Neither Defendant Straus nor Defendant Lugo ever disclosed to the Company Monello's corporate relationship with JC Mac Development LLC and SJN Services LLC.

### iii.    Defendants' Fraudulent Scheme with The Reichert Entities

53.    Defendants also devised and executed a similar fraudulent scheme with The Reichert Consult and P. Adam Studios ("the Reichert Entities"), which provided luxury event planning and interior design services and were owned and operated by Jared Reichert, Defendant Straus's close personal friend.

54.    In or around March 2018, Defendant Straus used her authority at the Company to award business to the Reichert Entities to organize corporate events and perform interior decorating and other services at various Company facilities. However, at the same time, Defendants also used Company funds through their corporate credit cards or through wire transfers from the Company's bank accounts to pay the Reichert Entities for non-business-related services performed for Defendants' personal benefit at their personal residences and vacation homes.

55.     Using Company funds, Defendants hired the Reichert Entities to provide furnishing services at Defendant Straus's Manhattan apartments located at 50 East 79th Street and at 888 Park Avenue.  On April 11, 2018, Jared Reichert sent Defendant Straus several invoices for various furniture purchases and interior design services that the Reichert Entities had provided to Defendant Straus at her 50 East 79th Street apartment from January 2018 to April 2018.  Defendant Straus directed Jared Reichert to remove details of the services provided, and to replace them with generic descriptions, such as "professional design fees" or "material purchasing," in order to conceal from the Company the fact that these were not legitimate business expenses.  Defendant Straus further caused Jared Reichert to agree to allow her to pay for services using her Company corporate credit card, rather than her own funds.  Further, in order to deceive the Company into paying the Reichert Entities for services that they provided for Defendants' personal benefit, Defendant Straus also instructed Jared Reichert to combine invoices, including those related to work for the Company and those for Defendants personally, into one invoice addressed to the Company and to remove details of the services provided.  On multiple occasions, Defendant Straus also instructed Jared Reichert to revise invoices for non-Company business related expenses and address them to the Company, so that the Company – rather than Defendant Straus personally – would be responsible for paying the invoices.

56.     After receiving the fraudulent invoices from Jared Reichert, Defendant Straus typically sent them to her executive assistant at the Company and instructed that she allocate the expenses to the Company as legitimate business expenses, without notifying the Company's finance team of these invoices.  Defendant Straus's executive assistant complied with these instructions, fearing that any pushback would cause Defendant Straus to verbally abuse or threaten her, or even terminate her employment.

57.    Defendants also hired the Reichert Entities to provide similar services at their apartment located at 35 Hudson Yards, New York, NY 10001, which the Defendants jointly leased in February 2021.  Defendants improperly caused the Company to pay virtually all costs associated with the 35 Hudson Yards apartment, including the $12,250 monthly rent, security deposit, broker fees, and the various services performed by the Reichert Entities at this apartment.  On February 3, 2021, Defendant Lugo instructed the Company's finance team to wire $24,500 to Elker Management for the first month's rent and security deposit for the apartment.  That same day, Defendant Lugo instructed the Company's finance team to send a broker fee of $6,125 to Camelot Brokerage Services Corporation.  Pursuant to those instructions, on or about February 3, 2021, the Company made two wire transfers for those improper payments from the Company's J.P. Morgan Chase bank account in New York.  Defendants then hired the Reichert Entities, using Company funds, to provide interior decorating and furnishing services, so that Defendants could cohabitate at the apartment.

58.    Defendants directed Jared Reichert to falsify invoices for the services that the Reichert Entities provided for the Defendants at their Hudson Yards apartment.  On February 22, 2021, Defendant Straus emailed Jared Reichert and asked him to refrain from sending detailed invoices to Defendant Straus's executive assistant, in order to conceal the personal nature of the work that the Reichert Entities had provided Defendants at the 35 Hudson Yards apartment.  Accordingly, on March 9, 2021, Jared Reichert sent Defendant Straus four itemized invoices for his work performed at Defendants' personal residences, including at the 35 Hudson Yards apartment and vacation homes.  Jared Reichert also attached a fraudulent invoice in which he had combined the four itemized invoices and misrepresented to the Company that the work had been performed at the Company's Harmony Village facility when, in actuality, the work was performed

at Defendants' residences and vacation homes.  Defendant Straus then submitted the fraudulent invoice to Company personnel and instructed them to use Company funds to pay for these expenses.  Eventually, in April 2021, Defendants terminated the lease for the 35 Hudson Yards apartment, which triggered a $49,000 termination fee that Defendants improperly caused the Company to pay via wire transfer on or about April 14, 2021 from the Company's J.P. Morgan Chase bank account in New York.

59.    Using Company funds, Defendants once again hired the Reichert Entities to move Defendant Lugo from the 35 Hudson Yards apartment to a new apartment he had leased at 70 Vestry Street, New York, NY 10013.  On April 21, 2021, Defendant Lugo entered into a lease for the 70 Vestry Street apartment, and improperly used Company funds to pay the $23,000 monthly rent, the security deposit, and, upon information and belief, for various services provided by the Reichert Entities at this apartment.

60.    On May 20, 2021, Defendant Lugo improperly caused the Company to pay approximately $95,000 to the Reichert Entities to plan and design Defendant Straus's extravagant birthday party in the Hamptons.  Expenses for the party included catering and the rental of an Airstream trailer ($31,225.90), a tent rental ($15,372.00), a portrait studio ($12,510.00), fireworks ($9,247.50), wine, champagne, tequila, and vodka ($8,263.74), rentals of tables, chairs, and serving items ($3,426.71), a birthday cake ($1,200.00), and car service ($1,224.00).  Upon receiving the invoice for the party from Jared Reichert, Defendant Lugo forwarded the document to the Company's controller at the time, Edison Nunez, and directed that he "pay this please when you have a moment."  Nunez complied with Defendant Lugo's instructions and paid the invoice with the Company's funds.

61.     Defendant Lugo, who oversaw the Company's payments to vendors, knew that many of the invoices from the Reichert Entities were for services performed for the benefit of Defendant Straus – rather than for the Company.  For instance, on July 22, 2021, Defendant Lugo forwarded Edison Nunez an invoice that he had received in his personal email account from Jared Reichert.  The invoice amounted to nearly $163,000 for personal furniture pieces from design shops, such as Egg Collective, a New York-based upscale design and furniture company, and 1stDibs, an online marketplace for antique and modern furniture, jewelry, fashion, and art.  Even though none of these purchases were for the Company's facilities or had any legitimate business purpose, Defendant Lugo directed Nunez to pay the invoice using Company funds and to let Defendant Lugo know once the Controller completed the payment "so [he] can let her know."

### iv.     Fraudulent Scheme Involving Health Capital HR LLC

62.     Defendant Lugo executed a similar fraudulent scheme with Health Capital HR LLC ("Health Capital"), which is a human capital consulting company owned by Defendant Lugo's wife, Carmen Lugo, as its sole member, a fact that Defendants concealed from the Company. Defendant Lugo caused the Company to award lucrative business to Health Capital without any competitive bidding process, and from 2014 to 2021, the Company made 48 payments to Health Capital for a total of approximately $5,400,000, even though Health Capital never provided any services to the Company.  Following a consistent pattern, Defendant Lugo fraudulently submitted invoices on behalf of Health Capital to the Company, and he directed Company employees to remit payments on the fraudulent invoices, even though Defendant Lugo knew that Health Capital never provided any service whatsoever to the Company.  Between 2015 and 2021, all 48 invoices from Health Capital contained the ambiguous description of the services provided as "Human Capital Consulting," which Edison Nunez noticed was insufficient especially due to the high dollar

amounts involved.  However, Nunez had been advised by a former employee to not question suspicious invoices due to possible retaliation from Defendants, and as a result, Nunez complied with Defendant Lugo's instructions to pay the Health Capital invoices.

### v.    Fraudulent Scheme Involving eInteractive

63.    Using Company funds, Defendants also hired eInteractive, a provider of home security systems, luxury home theater systems, and smart home automation systems to, among other things, install intricate surveillance systems and other audio equipment in their homes. Specifically, pursuant to Defendant Lugo's request, eInteractive purchased extensive surveillance equipment for Defendant Lugo's home in Eastchester, New York, and installed equipment with audio-visual features, motion detection, networking, and lighting functions.  Defendant Lugo paid eInteractive for these projects by sending unauthorized checks from the Company.  Knowing that paying for personal home surveillance systems using Company funds would raise questions at eInteractive, Defendant Lugo falsely represented that the Company was paying for these services as part of his bonus compensation.  Upon information and belief, Defendant Lugo proceeded to use these surveillance systems in his home for illicit purposes, including the production of child pornography.  On August 27, 2021, the Westchester County District Attorney's Office charged Defendant Lugo in Eastchester Town Court with Promoting an Obscene Sexual Performance by a Child, Possessing an Obscene Sexual Performance by a Child, and Unlawful Surveillance in the Second Degree.  According to the criminal Complaint, on or about December 16, 2020, Defendant Lugo, without knowledge or consent of a person, took "up-skirting" pictures of an approximately twelve-year-old female minor at his residence in which there was an undue focus underneath her clothing and upon the genital area.  Upon information and belief, Defendant Lugo took these illicit

photographs using the equipment that he had purchased from eInteractive using unauthorized Company funds.

**C.   Defendants Improperly Used Company Resources to Finance their Vacation Homes**

64.    Upon information and belief, from at least 2018 to 2021, Defendant Straus leased summer vacation properties in the Hamptons using unauthorized Company funds.  The Company paid not only for the leases, but also for the security deposits, brokers fees, decorations, utilities, and cleaning services at these properties.

65.    In 2018, Defendant Straus rented a house located at 104 Halsey Lane, Bridgehampton, New York, and paid for the costs associated with the lease using Company funds. Defendant Straus directed Company personnel to write unauthorized checks to pay for the Bridgehampton property's rent, as well as the associated broker fees and security deposit.  Upon information and belief, Defendant Straus retained the security deposit paid by the Company after the leased expired.

66.    In 2019, Defendant Straus rented a house located at 1150 Deerfield Road, Water Mill, New York, and directed the Company to write unauthorized checks to pay for the property's rent, brokers fees, and security deposit.  Upon information and belief, Defendant Straus retained the security deposit paid by the Company after the leased expired.

67.    In 2020, Defendant Straus signed a 2-year lease agreement for a house located at 55 Coopers Neck Lane, in Southampton, New York, and paid for the $125,000 monthly rent, utilities, brokers fees and security deposit, which totaled over $1,338,710, with unauthorized Company funds.  Specifically, Defendant Lugo directed the Company's Controller Mr. Nunez to make the monthly payments for the Southampton house and related expenses, and Nunez subsequently set up recurrent payments from the Company's bank accounts.  Upon information

and belief, after the lease expired, Defendant Straus improperly retained the security deposit paid by the Company after the lease expired.

68.    On March 3, 2021, Nunez emailed Defendant Lugo to express his concerns about the Company's temporary liquidity issue.  Defendant Lugo forwarded Nunez's email to Defendant Straus, who then explained that while she could cut down spending in other areas, the Company needed to pay for the Southampton property expenses. Therefore, upon Defendant Straus's insistence, Defendant Lugo directed Nunez to continue making improper payments for the Southampton home using Company funds.

69.    In an attempt to mislead the Company into believing that Defendant Straus was paying expenses for the vacation home in Southampton with her personal funds, Defendant Lugo instructed Defendant Straus to wire $450,000 to Care One, which she did on March 3, 2021. Defendants instructed Nunez to send a screenshot of the incoming wire to a Company executive. However, just six days later, Defendant Lugo directed Nunez to wire $450,000 back to Defendant Straus,            without            informing            the            Company.

| | | | | |
|---|---|---|---|---|
| ☐ 03/03/2021 | ELIZABETH SARA STRAUS | 1 | INCOMING WIRE REF# 20210303B6B7261F00383503031550FT01 0000018 839 FROM: ELIZABETH SARA STRAUS ABA: 021000021 BANK: | $450,000.00 |
| ☐ 03/09/2021 | Elizabeth Straus | 1 | OUTGOING WIRE REF# 20210309B6B7261F002676 TO: Elizabeth Straus AB A: 021000021 BANK: JPMORGAN CHASE BANK, NA ACC T# 626330349 | $450,000.00 |

### D.  Defendants Diverted $1.5 Million in Checks to the Company

72.    Between approximately March 2020 and June 15, 2021, Defendant Straus wrote approximately nine checks to a Care One subsidiary from her personal bank account totaling more than $1.5 million, which Defendant Straus provided to Defendant Lugo. The checks were

27

negotiated at a PLS check cashing service in New York, New York.  Upon information and belief, Defendant Lugo converted those funds for his personal use.

### E.   Defendant Lugo Directed the Use of Company Funds to Pay for Legal Counsel to Defend Him Against the Child Pornography Charges

73.    In 2021, Defendant Lugo improperly directed the Company's finance team to make payments to a law firm for his legal representation related to the child pornography charges against him in Westchester County.  Specifically, Defendant Lugo improperly directed approximately $150,000 to be paid to Perry Guha LLP for legal services provided for Defendant Lugo's personal benefit.

74.    Also in 2021, Defendant Lugo improperly caused to be paid $400,000 to the law firm Aiello & Cannick from Company funds for services unrelated to the Company and had no Company business purpose.  Upon information and belief, that law firm provided services for the personal benefit of Lugo and/or a personal associate of Lugo.

### F.   Defendants Destroyed or Concealed Evidence of their Fraud and Attempted to Thwart the Company Inquiry

75.    To prevent the Company from discovering their fraudulent scheme, evidence of Defendants' sexual relationship, and Defendant Lugo's involvement in producing child pornography, the Defendants fabricated documents and, upon information and belief, deliberately destroyed evidence.  These actions included, among other things, directing employees to physically destroy the Company's electronic devices, and, as alleged above, generating fraudulent supporting documentation to justify personal expenses charged to the Company.

76.    On September 11, 2019, Defendants contacted Mark Fernands, the Company's Director of Information Technology at the time, and directed that he physically destroy three or four laptops and iPad devices.  Upon information and belief, this was done by Defendants to

conceal evidence of their illegal activities. After retrieving the devices from Defendant Straus, Fernands asked whether he should erase the contents contained in them. However, Defendant Straus explicitly ordered Fernands to have them physically "smashed." Defendant Straus then asked Fernands on September 11, 2019 to "send [her] the pictures that [he] destroyed all the equipment that [she] gave [him] yesterday." Fernands responded that "[he] planned on destroying them on Saturday. [The devices] are in the trunk of [his] car. [He] will send [her] the before and after pictures." Defendant Straus then asked him to "please do perhaps tomorrow since Alberto and I would feel both better if you did." On the following day, September 12, 2019, Fernands proceeded to destroy those devices with a sledgehammer in his backyard, and sent photographs of his actions to both Defendants.



77.    In early September 2021, after Defendant Lugo had been arrested and charged in Eastchester Town Court for child pornography and unlawful surveillance, he called Gary Jacob, an IT Clerk at the Company at the time, to retrieve four MacBook computers inside of a locked cabinet at the Company's headquarters. At the time, the Company had placed Defendant Lugo on administrative leave due to his criminal charges, and the Company's then-Deputy General Counsel had instructed the Company's IT team to retain the four devices in the locked cabinet in order to preserve potential contraband related to Defendant Lugo's criminal charges. However, without authorization, Defendants used their authority to override the Deputy General Counsel's

directives to the IT team, and Defendant Straus retrieved the devices and transported them to her apartment at 888 Park Avenue in Manhattan, New York. Upon information and belief, thereafter, she disposed of the laptops in order to conceal evidence of the Defendants' illegal activities.

78.    In September 2021, after Defendant Lugo had been arrested and charged with child pornography and unlawful surveillance, the Company began an inquiry into Defendant Lugo. In an effort to thwart the Company's inquiry into Defendants' actions, Defendants called Nunez, Care One's Controller at the time, and ordered him to lie to the Company about the nature of the payments he had made to various vendors on Defendants' behalf.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)
(Against all Defendants)**

79.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth full herein.

80.    Plaintiffs bring this count against all Defendants for violations of 18 U.S.C. § 1962(c).

81.    Defendants Straus and Lugo are culpable "persons" who willfully and knowingly committed and conspired to commit two or more acts of wire fraud, possession and interstate transportation of child pornography, money laundering, and various New Jersey state crimes, through a pattern of racketeering activity that involved an "association in fact" enterprise, the result of which had an effect on interstate commerce.

a. **Defendants are Culpable "Persons" under RICO**

82.     Defendants Straus and Lugo, separately, are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

83.     Each one of Defendants Straus and Lugo are separate "persons" that are distinct from the RICO enterprise alleged below.

b.  **The Straus-Lugo RICO Enterprise**

84.     For the purposes of this claim, the RICO enterprise consists of Defendant Straus and Defendant Lugo, as well as Monello and the Reichert Entities.

85.     This association-in-fact enterprise is referred to herein as the "Straus-Lugo Enterprise."

86.     Plaintiffs allege that the existence of an association-in-fact enterprise comprised of:

a.  Defendant Elizabeth S. Straus (director of enterprise);

b.  Defendant Androsky Lugo (director of enterprise);

c.  Monello Landscape Industries, Inc. (participant of enterprise); and

d.  The Reichert Entities (participant of enterprise).

87.     The above-mentioned individuals and entities conducted and participated in the Straus-Lugo Enterprise to enrich its members through unlawful activities including but not limited to: the embezzlement of over $40,000,000 from the Company; causing the Company to pay for non-business related purchases on corporate and personal credits cards, including for luxury goods and travel;  use false documents and invoices to cause the Company to pay vendors, such as Monello and the Reichert entities, for work that the vendors performed for Defendant Straus or Defendant Lugo's personal benefit; Defendant Straus and Defendant Lugo's abuse of their

positions at the Company to approve improper payments to various vendors, such as Monello and the Reichert Entities, and other payments for their personal non-business expenses; intimidation of termination of Company employees that raised concerns about Defendant Straus, Defendant Lugo, Monello or the Reichert Entities; wire fraud; manufacture and interstate transport of child pornography; money laundering; theft by unlawful taking, theft by deception; misapplication of entrusted property; corporate misconduct; and falsification of records.

88.    The above-mentioned individuals and entities conducted and participated in the Straus-Lugo Enterprise from at least 2015 to 2021.

89.    Defendants' enterprise has continuity, structure, and a shared unlawful purpose of enriching its members.

### c.  Defendants' Use of the U.S. Interstate Wire Facilities

90.    The Straus-Lugo Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries between at least 2015 and September 2021: the provision and/or the receipt of services in New York and New Jersey; wire transmissions and/or receipt of invoices, statements, and payments, including causing the Company to regularly make improperly make payments via check and wire transfer as alleged above, between 2015 and September 2021, from Company bank accounts at J.P. Morgan Chase in New York; the wire transmissions and/or receipt of text messages, emails, and other forms of communications across states, i.e., primarily New York and New Jersey, that were used to communicate about the illegal activities and further the activities of the Straus-Lugo Enterprise.

### d.  Conduct of the Straus-Lugo Enterprise's Affairs

91.    Each Defendant and member of the Straus-Lugo Enterprise participated in the operation and management of the Straus-Lugo Enterprise with which it is associated and, in violation of Section 1962(c) of RICO, conducted or participated in the conducts of the affairs of the association-in-fact RICO enterprise, directly or indirectly.  Such participation was carried out in the following ways, among others:

a.    Defendant Straus and Defendant Lugo, as senior executives of the Company, directly oversaw the Company's selection of vendors, processing of invoices, and the Company's payments to vendors, among other responsibilities.

b.    Defendant Straus and Defendant Lugo agreed with Monello, a landscape design and installation company, to award Monello with lucrative Company business, in exchange for Monello's assistance with defrauding the Company and embezzling funds from the Company.

c.    Defendant Straus and Defendant Lugo exploited their positions at the Company to award contracts to Monello.

d.    From 2015 to 2021, at Defendant Straus and Defendant Lugo's direction, Monello performed non-Company business related services at, among other places, the personal residences of Defendant Lugo and his family.

e.    From 2015 to 2021, pursuant to Defendant Straus and Defendant Lugo's direction, Monello fabricated invoices that combined legitimate services performed for the Company and the non-business-related services provided for Defendant Lugo's personal benefit.  Further, pursuant to Defendant Straus and Defendant Lugo's

instructions, Monello intentionally obfuscated the invoices to conceal from the Company the services provided.

f.  As senior executives at the Company with complete insight into Plaintiffs' finances, Defendant Straus and Defendant Lugo guided Monello on how to submit invoices to the Company without raising suspicions.

g.  For example, on multiple occasions from 2015 to 2021, Defendant Straus directed Monello through email, text message, or other forms of communication to send invoices to specific Company facilities, depending on Defendant Straus's intimate knowledge of the facilities for which large expenses would not raise suspicions within the Company at the time.

h.  Upon receipt of the invoices from Monello, Defendants Straus and Defendant Lugo used their senior positions at the Company to direct the finance team to pay Monello for both the legitimate services performed for the Company, as well as the unauthorized services provided to Defendant Lugo's personal benefit.

i.  Defendant Straus and Defendant Lugo suppressed any suspicions at the Company regarding Monello, by threatening, abusing, or terminating the employment of any employee that voiced any concerns about Monello or its invoicing practices.

j.  In exchange for Defendant Straus and Defendant Lugo's corrupt granting of significant amounts of Company business to Monello, Monello provided free services to Defendant Lugo and his family as a form of *quid pro quo.*

k.  From at least 2018 to 2021, Defendant Straus and Defendant Lugo also devised and executed a plan with Jared Reichert to defraud and embezzle funds from the Company.

l.  From at least 2018 to 2021, at Defendant Straus's and Defendant Lugo's instructions, Jared Reichert performed interior decorating, furnishing, and other services at the residences of Defendant Straus and Defendant Lugo.

m.  On multiple occasions from at least 2018 to 2021, Defendant Straus instructed Jared Reichert through email, text message, or other forms of communication on how to submit fraudulent invoices to the Company without raising suspicions at the Company.

n.  From at least 2018 to 2021, pursuant to Defendant Straus's directions, Jared Reichert fabricated invoices that combined legitimate services performed for the Company and the non-business-related services provided for Defendant Straus and Defendant Lugo's personal benefit.  Further, pursuant to Defendant Straus and Defendant Lugo's instructions, Jared Reichert intentionally obfuscated the invoices to conceal from the Company the services that he had provided.

o.  Upon receipt of the fraudulent invoices from Jared Reichert, Defendants Straus and Defendant Lugo would use their senior positions at the Company to direct the finance team to pay Jared Reichert for both the legitimate services provided to the Company, as well as the unauthorized services provided to Defendant Straus and Defendant Lugo's benefit.

p. From 2015 to 2021, Defendant Straus and Defendant Lugo embezzled funds from the Company by making unauthorized purchases on their Company corporate credit cards and then abused their positions at the Company to ensure that the Company paid for these charges. Every month during this time, Defendant Straus and Defendant Lugo made significant amounts of unauthorized purchases on their Company corporate credit cards. Each month, when the Company received the corporate credit card statements, Defendant Straus and Defendant Lugo misrepresented to Company personnel that these charges were for legitimate business expenses in order to induce the Company into paying the card balances.

q. On numerous occasions including in or about July 2020 and December 2020, Defendant Lugo possessed child pornography in New York and then subsequently transported the contraband to the Company's offices in Fort Lee, New Jersey.

r. From 2015 to 2021, Defendant Straus and Defendant Lugo caused the Company to make additional unauthorized payments to vendors that had provided personal services for Defendant Straus's and Defendant Lugo's personal benefit.

s. In 2018 and 2019, Defendant Straus misappropriated Company funds to pay the rent, broker fees, and security deposits associated with two vacation homes located in Bridgehampton, New York, and Water Mill, New York, respectively. Upon information and belief, when leases for these two properties expired, Defendant Straus improperly retained the security deposits, thereby disguising the unlawful origins of those funds and giving the appearance that they were legitimate funds from returned security deposits.

e.  **The Defendants' Patterns of Racketeering Activity**

92.    From at least 2015 through 2021, the Straus-Lugo Enterprise engaged in a pattern of racketeering activity including the following predicate acts pursuant to 18 U.S.C. § 1961(1):

a.  **Wire Fraud (18 U.S.C. § 1343)**: From 2015 to 2021, Defendants used electronic emails, text messages, and wire services in interstate commerce to: coordinate fraudulent schemes with other members of the Straus-Lugo Enterprise (*e.g.*, Defendant Straus sending texts and emails to Monello, Jared Reichert, and other vendors about fabricating false invoices to submit to the Company; Monello and Jared Reichert emailing fraudulent invoices to Defendant Straus and Defendant Lugo); conceal their fraudulent scheme by threatening Company staff that voiced concerns about the Defendants' activities; transmit fraudulent invoices to the Company (*e.g.*, Defendant Straus and Defendant Lugo sending emails to Company staff attaching the fraudulent invoices Defendant Straus and Defendant Lugo instructed vendors to create); direct the Company's staff to make payments to vendors and credit card companies for fraudulent purchases made by Defendant Straus and Defendant Lugo; and cause payments in the form of wire transfers and checks from Company bank accounts at J.P. Morgan Chase bank in New York

b.  For example: on or about July 30, 2020, Defendants improperly caused the Company to make a wire transfer of approximately $144,000 of Company funds from a J.P. Morgan Chase bank account in New York to pay for costs associated for Defendant Straus's personal vacation rental in Long Island, New York; on or about February 3, 2021, Defendant Lugo emailed the Company finance team and, on or about that same day, improperly caused the Company to make a wire transfer of

approximately $12, 250 of Company funds from a J.P. Morgan Chase bank account in New York to pay for costs associated with a personal apartment rental for the Defendants' personal use;  on or about April 14, 2021, Defendant Lugo caused the Company to make another transfer of approximately $49,000 of Company funds from a J.P. Morgan Chase bank account in New York for pay for costs associated with a personal apartment rental for the Defendants' personal use.

c.  **Possession and Interstate Transportation of Child Pornography (18 U.S.C. § 2252A(a)(5)(b) and 18 U.S.C. § 2252(a)(1)):** In 2020, including in July 2020 and December 2020, Defendant Lugo knowingly possessed child pornography at his home in New York, and physically transported devices containing these materials to his Company office in New Jersey where he stored his contraband.

d.  **Money Laundering (18 U.S.C. § 1956):** Defendants conducted financial transactions, with full knowledge that the property involved in the financial transaction were the proceeds from the Defendants' fraudulent activities against the Company, with the intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the wire fraud.  As described herein, through their fraudulent schemes using text messages, email communications, and wire services from 2018 to 2021, Defendants caused the Company to make unauthorized payments in connection with three vacation homes in New York that Defendant Straus had leased.  These payments by the Company included, among other things, the security deposit, rent, and broker fees for these properties.  Upon information and belief, once the leases for those properties expired, Defendant Straus improperly retained the security deposits, thereby disguising the unlawful

origins of those funds and giving the appearance that they were legitimate funds from returned security deposits. Further, from 2020 to June 2021, Defendant Straus wrote approximately 9 checks totaling over $1.5 million to a Care One subsidiary that Defendants Straus and Lugo caused to be negotiated at a PLS check cashing service in New York, New York for the purpose of preventing the Company's receipt of funds and converting those funds for personal use. Those checks include a June 15, 2021 check to a Care One subsidiary for $250,000 that was subsequently negotiated at PLS. Those funds were not provided to the Company. By negotiating the checks at PLS, Defendants were able to steal those funds and give the appearance they were legitimate funds.

e. **State Crimes**: Including theft by unlawful taking (N.J.S.A. 2C:20-3), theft by deception (N.J.S.A. 2C:20-4), corporate misconduct (N.J.S.A. 2C:21-9), forgery (N.J.S.A. 2C:21-1), tampering with evidence (N.J.S.A. 2C:28-6), and misapplication of entrusted property (N.J.S.A. 2C:21-15).

93.    Each Defendant's pattern of racketeering involved hundreds, if not thousands, of separate instances of use of the U.S. interstate wire facilities in furtherance of their illicit activity over each year from 2015 upon to and including 2021. Each of these interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Defendant intended to defraud Plaintiffs.

94.    By intentionally preparing and submitting fraudulent invoices to the Company, and by abusing their positions at the Company to cause the Company to make improper payments to various vendors and other entities for the Defendants' benefits, by concealing their fraudulent

activities from the Company, and by laundering the proceeds of their fraud through various methods, each Defendant engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

95.    Each Defendant's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive and defraud the Company.

96.    Each separate use of the U.S. interstate wire facilities employed by each Defendant was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results of affecting the same victim, the Company.

97.    Each Defendant, Monello, and the Reichert Entities engaged in a pattern of racketeering activity for the purpose of conducting the affairs of the Straus-Lugo Enterprise, with which each of them was associated in fact.

f.    **The Motives of the Straus-Lugo Enterprise's Members**

98.    Each Defendant and member or associated of the Straus-Lugo Enterprise's motives in creating and operating the scheme to defraud the Company and conducting the affairs of the Straus-Lugo Enterprise described herein was to siphon funds from the Company to the Defendants and members of the Straus-Lugo Enterprise, and to pay for their personal purchases.

g.    **The Straus-Lugo Enterprise's Scheme Injured Plaintiffs Care One**

99.    Each Straus-Lugo Enterprise's violations of federal law and pattern of racketeering activity directly and proximately caused the Company to be injured in its business or property.

100.    The Defendants and other members of the Straus-Lugo Enterprise fraudulently schemed and caused the Company to pay vendors for services that were never provided to the

Company, to overpay for services provided to the Company, or to pay for the Defendants' personal purchases that had no connection to the Company's business.

101.    Thus, from 2015 to 2021, the Defendants, through the operation of the Straus-Lugo Enterprise, defrauded the Company of over $40,000,000.

<u>**COUNT II**</u>
**Violations of RICO, 18, U.S.C. § 1962(d)**
**by Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Against all Defendants)**

102.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

103.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), and (c) of this section."

104.    Defendants have violated 18 U.S.C. § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy has been and is to conduct or participate in the scheme to defraud the Company.

105.    As set forth in detail above, Defendants each knowingly devised and executed their scheme to defraud the Company and each engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.  Specifically, Defendants agreed to and did provide fraudulent invoices from various vendors, such as Monello and Jared Reichert, to the Company in order to induce payment by the Company for the Defendants' unauthorized purchases; Defendants agreed to and did make unauthorized purchases on their corporate credit cards and made material representations to the Company to induce the Company into paying for these unauthorized purchases; Defendants agreed to and did cause the Company to make payments via wire transfer or checks to various vendors for unauthorized purchases for their personal benefit, by mispresenting to the Company the nature of these charges.

41

106.    The nature of the above-described Defendant co-conspirators' acts and material misrepresentations in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring the violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

107.    Defendants engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

    a.    Multiple instances of wire fraud violations of 18 U.S.C. § 1343, including wires on or about July 30, 2020; March 26, 2021; and April 14, 2021;

    b.    Multiple instances of possession and interstate transportation of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(b) and 18 U.S.C. § 2252(a)(1);

    c.    Multiple instances of money laundering in violation of 18 U.S.C. § 1956; and

    d.    New Jersey State crimes, such as theft by unlawful taking (N.J.S.A. 2C:20-3), theft by deception (N.J.S.A. 2C:20-4), corporate misconduct (N.J.S.A. 2C:21-9), forgery (N.J.S.A. 2C:21-1), tampering with evidence (N.J.S.A. 2C:28-6), and misapplication of entrusted property (N.J.S.A. 2C:21-15).

108.    Defendants' conspiracy to violate the above federal laws and the effects thereof are detailed above reveal a pattern of racketeering activity spanning over 6 years. Plaintiffs have been injured in their property by reason of these violations: Plaintiffs would not have incurred over $40,000,000 in losses but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

109.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorney's fees.

### COUNT III
**Breach of Fiduciary Duty**
**(Against All Defendants)**

110.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

111.    Defendant Straus, as Executive Vice President, and Defendant Lugo, as Executive Vice President and General Counsel, owed fiduciary duties to the Company, which entrusted Defendants to oversee the Company's day-to-day operations.  In their positions at the Company, Defendants owed the Company a duty of fidelity and loyalty in performing their obligations.

112.    However, in violation of their fiduciary duties, Defendants defrauded the Company into paying for their improper personal expenses.

113.    Defendants Straus and Lugo propositioned an employee for sex and coerced that employee to assist in their scheme to defraud the Company, resulting in a hostile work environment and the unjustified termination of a top Company employee.

114.    As a direct and proximate result of Defendants' breach of fiduciary duties owed to the Company, the Company suffered losses of over $40,000,000.

### COUNT IV
**Common Law Fraud**
**(Against All Defendants)**

115.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

116.    Defendants made numerous material representations (and omissions) of fact to the Company, by, among other things, causing the fabrication of invoices that vendors and other

members of the Straus-Lugo Enterprise submitted to the Company and representing to the Company that the invoices were for work performed at various Company locations, when in fact, the work had been performed for Defendants' personal benefit.  Further, Defendants represented to the Company that charges made on their corporate credit cards were authorized business expenses, when in fact, they were unauthorized personal purchases of clothing, luxury goods and services, private air services, vacations, interior decorating services, furnishings for their homes and vacation homes, among others, that had no business purpose.  Defendants made representations and omissions to the Company, with full knowledge of their falsity, in order to induce the Company into paying for their extravagant personal purchases.

117.    The Company relied upon Defendants, who were the two most senior executives that directly oversaw the Company's day-to-day operations, to determine which vendors and credit card charges to pay.  But for the Defendants' misrepresentations, the Company would not have paid for Defendants extravagant personal purchases that had no connection with Company business.

118.    As a direct and proximate result of Defendants' misrepresentations and omissions, the Company suffered losses of over $40,000,000.

**COUNT V**
**Common Law Negligent Misrepresentation**
**(Against All Defendants)**

119.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

120.    Defendants made numerous material representations (and omissions) of fact to the Company, by, among other things, causing the fabrication of invoices that vendors and other members of the Straus-Lugo Enterprise submitted to the Company and representing to the Company that the invoices were for work performed at various Company locations, when in fact,

the work had been performed for Defendants' personal benefit.  Further, Defendants represented to the Company that charges made on their corporate credit cards were authorized business expenses, when in fact, they were unauthorized personal purchases of clothing, luxury goods and services, private air services, vacations, interior decorating services, furnishings for their homes and vacation homes, among others, that had no business purpose.  Defendants' representations and omissions to the Company were, at a minimum, negligent and resulted in the Company paying for their extravagant personal purchases.

121.    The Company relied upon Defendants, who were the two most senior executives that directly oversaw the Company's day-to-day operations, to determine which vendors and credit card charges to pay.  But for Defendants' negligent misrepresentations and omissions, the Company would not have paid for Defendants' extravagant personal purchases that had no connection with Company business.

122.    As a direct and proximate result of Defendants' negligent misrepresentations and omissions, the Company suffered losses of over $40,000,000.

**<u>Count VI</u>**
**Common Law Conversion**
**(Against All Defendants)**

123.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

124.    Defendants conspired with other members of the Straus-Lugo Enterprise to submit fraudulent invoices to the Company and abused their positions to cause the Company to make unauthorized payments for their personal expenses charged to their corporate and personal credit cards.  Through such methods, Defendants, improperly and without authorization, spent over $40,000,000 of funds that belonged to the Company, to pay for their extravagant lifestyles and make other personal purchases.

125.    After the Company discovered Defendants' fraudulent conduct and massive embezzlement scheme, Defendants refused to return the funds that they had embezzled from the Company.

126.    As a direct and proximate result of Defendants' conversion, the Company suffered losses of over $40,000,000.

**Count VII**
**Unjust Enrichment**
**(Against All Defendants)**

127.    Plaintiffs repeat and reallege the allegations set forth above as if fully stated herein.

128.    Defendants conspired with other members of the Straus-Lugo Enterprise to submit fraudulent invoices to the Company and abused their positions to cause the Company to make unauthorized payments for their personal expenses.  Through such methods, Defendants, improperly and without authorization, spent over $40,000,000 of funds that belonged to the Company, to pay for their extravagant lifestyles and make other personal purchases.

129.    There was no justification for Defendants' conduct and they were unjustly enriched to the detriment of Plaintiffs.

130.    As a direct and proximate result of Defendants' conversion, the Company suffered losses of over $40,000,000.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment against Defendants, jointly and severally, as follows:

a.    A judgment in favor of Plaintiffs and against Defendants;

46

b.  Determining that Defendants have violated RICO, have conspired to violate RICO, have breached their fiduciary duties to Plaintiffs, have committed common law fraud, negligent misrepresentations, and conversion, and alternatively that they were unjust enriched.

c.  Damages, treble damages, statutory damages, and punitive damages, where applicable;

d.  Restitution, disgorgement, disgorgement of compensation earned during the period of their breaches of the duty of loyalty, and other just relief;

e.  An order awarding Plaintiffs damages in an amount to be determined at trial for the wrongful acts of Defendants;

f.  Pre- and post-judgment interest on all amounts awarded;

g.  Reasonable attorneys' fees and costs, as allowed by law; and

h.  Such other or further relief as the Court may deem appropriate, just, equitable, and proper.

## JURY DEMAND

Plaintiffs Care One, LLC and Care Realty, LLC of Fort Lee, New Jersey demand trial by jury on all issues so triable.

## <u>VERIFICATION UNDER LOCAL CIVIL RULE 11.2</u>

I certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.  Pending in this court is a related

action involving different claims but some of the same parties, Case No. 2:25-cv-02606-MCA-SDA.

Dated: July 3, 2025

___s/ *Michael S. Stein*___
Michael S. Stein
Sean Mack
PASHMAN STEIN WALDER
HAYDEN, PC
21 Main Street, Suite 200
Hackensack, NJ 07601
201-488-8200
Mstein@pashmanstein.com

Rita M. Glavin
Lee S. Gayer
Thomas P. Halpern
Leo S. Korman
Alexander S. Holland
GLAVIN PLLC
156 West 56th Street, Ste. 2004
New York, NY 10019
Tel: (646) 693-5505
rglavin@glavinpllc.com

*Counsel for Plaintiffs Care One,
LLC and Care Realty, LLC*
